District Court is now in session. May it please the court. Council, I'm John Strauss and I represent the plaintiff appellants, Jessica and Corey Kampschroer. The district court erred in two ways. First, it weighed evidence and made factual determinations at the summary judgment stage. And second, it applied the wrong test to determine equitable tolling, creating a new burden for plaintiffs to meet. Here, the Minnesota Department of Public Safety, through one of its directors, is now in session. Second, the district court's misled Jessica Kampschroer into believing that only one person had access to her driver's license information in 2008, when in fact, at that point, 600 law enforcement personnel throughout the state had looked her up. By 2013, she and her husband had been looked up 1,300 times. Jessica provided extraordinary circumstances of the department lulling her into inaction and her reliance on the department's multiple assurances that the access of Jessica was isolated and the system would be monitored for misuse in the future was reasonable. Jessica provided evidence of her diligence in twice contacting DVS in 2008 to express her concern and find out what was going on. And then upon learning the extent... Did nothing until 2013. Because she was assured that there was nothing that she had to do. This was an isolated incident. It was portrayed as an isolated incident to her, that there was nothing to worry about. The employee had been disciplined and she had no reason to believe... Well, she wasn't dealing with DMV. She absolutely was dealing with the DMV. The Department of Public Safety, DVS, Driver and Vehicle Services is the Minnesota equivalent of the DMV. So yes, and the director of the DVS... Was aware of the ability to request an audit. She had no reason to request an audit at that time. She was told by Patricia McCormick, who's the director of the Driver Vehicle Services, and Driver Vehicle Services is the sole repository in the state of Minnesota of all driver's license information. It has the ability to monitor, to audit, to discipline users. She would not have been... Celebrities in this period of time had plenty of information or suspicion that this was going on. Absolutely not, Your Honor. The first case where this was brought was, whether there was any lawsuit in Minnesota about this type of conduct, was in 2011 by Ann Rasmussen. So there was nothing in 2008 about that. There was no news about it. And even if it was, Jessica Kampscher testified she didn't know anything about it. She was told by Patricia McCormick, the director of DVS, that this was an isolated incident. Didn't the record show that even after that conversation, she did some follow-up investigation herself, on her own, and then with the assistance of, I think, the general counsel from the television station? So that she did take action after that conversation? That's how the defendant appellees portray it, but that's not what the record shows, and at the very least is disputed. What she did was, a few weeks after her first contact with Director McCormick, she received notice from her bank that there was some strange activity with her account. And since it was slow closing time with her initial discussions with Patricia McCormick, she went back and contacted her again and said, What's going on? Are these related? She then spoke to her employer's attorney, her employer's Hubbard Broadcasting, and the employer's attorney, who deals with security issues for employees there, wrote a letter to TCF and to Patricia McCormick. That was all related to the one access that they were informing her about, when they were actually sitting on 600 accesses that they didn't inform her about. It was the practice of DVS at the time, this is from testimony of its data unit administrator, Kim Jacobson, and McCormick, that it was the practice at the time that if there was a well-known person like Jessica Kamsher, that it would do a more extensive check to make sure that there wasn't a broader access to them. It was also the practice, if there was a concerned citizen, that it would do a broader examination of what was going on. But they didn't inform her of any of that, but DVS knew about 600 of them. It possessed that information, was the only one with that information. Anyway, what we're talking about here are disputed facts. Those are things that shouldn't be decided at summary judgment. When there's disputed testimony, both Barnum and Jessica said that he wasn't her attorney, he wasn't doing an investigation on her behalf, it was only about the one access they knew about. That's not something that should be weighed at summary judgment. I'm sorry. So your point is what you're saying is in viewing the facts in the light most favorable to your client, what happened there was that she and the lawyer were following up on the single access that McCormick had identified? Absolutely. I mean, the letter that she got from McCormick talks about an employee's misuse, appropriate steps were taken, and it concludes with we take our responsibility for data security very seriously and will continue to monitor employees. What about was there evidence that she knew about a television show through her station and had presented some information on the air about something like this data access? Yes. Well, I mean, I would say no. The defendants presented some evidence that there were some stories on her. There was a story about one or two people who had been disciplined for looking up a bunch of people. She wasn't one of the people who had done that. Did she deny knowing about that? No, I think she knew about that one story, but the fact that somebody else was violating other people's data and she didn't receive notice that she was one of those people wouldn't give her a reason to conclude that she was one of those people. The one time that she knew about her being accessed, DVS did contact her. So there's no reason for that. And then there's all these other stories that maybe were broadcast when she was working or on other stations, but the testimony from Jessica Hampshire is she didn't hear those. When she was on the air, she was listening for cues from her producer. She wasn't concentrating on what else was going on in the newscasts. But anyway, that's weighing evidence. That's weighing the credibility of her testimony. This was a summary judgment determination, not an evidentiary hearing. Well, so are you relying on something the department did, or are you just saying she lacked knowledge of her claims and that's enough to justify tolling? The test in tolling, of course, as you know, is reasonable diligence, not maximum diligence. Reasonable diligence by the individual and extraordinary circumstances. What we're saying is the extraordinary circumstance here, or one of them, is that she was lulled by the department. Now, it doesn't have to be an intent to deceive. The department doesn't have to intend to deceive her. It just has to have lulled her, and it did deceive her, and misled her into thinking there was only one access. So your argument does hinge on whether that was a misleading letter. Not just a misleading letter. There were two conversations afterwards. A misleading set of communications. Absolutely. Now, it doesn't have to be intentionally misleading. That would be a stopple. This is equitable tolling that we're seeking. And it was misleading. I mean, here we have testimony from testimony from Patricia McCormick, the person that had the two phone calls and sent the letter to Jessica Kampscher. And although she wasn't consistent on this point, Ms. McCormick, Director McCormick, testified that DVS did run a more extensive audit on Jessica. When asked if DVS would have checked to make sure there weren't other inappropriate accesses of a local TV news reporter with concerns, McCormick says, I think we tried to make sure that we had checked all that out to make sure that there wasn't anything. I think that the department did that anyway. I think we would have done that. Those are our usual way of handling things. That's at McCormick's deposition at page 128, 129. That's just her testimony about what they did, not what she told the plaintiff. Right. So let's talk about that. What I cited was the appendix of 457, 458. Let's talk about what she told the plaintiff. Well, I don't understand what, well, go ahead. I don't understand what the other part is. What I'm talking about is that DVS would normally look and find out this information. So it would be odd that they did that and not tell her about the 600 accesses when she showed concern. But what she did testify to, and again, she wasn't consistent on this, but this is not, it wasn't an evidentiary hearing. It's a summary judgment hearing. Inferences are supposed to be made in the non-movement's favor, in this case my client's. And this is what McCormick testified in her deposition. This is at page A465. I think I was saying that it was an isolated incident with her. It was an isolated incident, yeah. That's what I would have said. So there we have the director of DVS, the one person that Jessica Kampscher can get this information from, saying that it was an isolated incident. Now she backtracks on that at some point, but she said that at her deposition. So for the court, district court, to disregard that. You think that that led a reasonable person to think that she had checked all law enforcement agencies and that there was no accessing by anybody else? It would lead a reasonable person to think that this is an isolated incident, just like it was portrayed, that there weren't any other accesses. Well, the question is what does isolated incident mean? Isolated in what sense? Well, I don't know what else it could mean besides that there aren't other. I mean, I'm calling because you told me somebody accessed. Limited to DVS employees. Well, there were two of those. She only told them about one. If you want to limit it to state actors, there are 20 of those. She only told them about one. But there were 580 other people. So, I mean, she knew about two. She testifies left and right. She knew about two. She only told Jessica Kampscher about one of them. I don't see how isolated incident could otherwise be portrayed than as I'm telling you that she's saying I'm concerned. I'm calling you after I got this letter. I'm concerned about it. What's going on? What else do we have to worry about? And she says nothing. It's an isolated incident. You don't think isolated incident could refer to DVS employees? Well, if it did, then there were two, and she only told her about one. We cite that many times in our brief. What's the relevance of the second employee? Well, why would it be an isolated incident? Isolated incident, it's singular. It's not plural. I don't understand. I mean, that's not accurate. That's misleading. DVS was misleading her. But anyway, these are facts. How contemporaneous were the two? How contemporaneous were the two? Well, they had just both. I don't know. They had both happened before the conversation with McCormick. But how can this be? When you interrogated Ms. McCormick, what did she say about the other one? And why didn't she say that? She wasn't consistent, and she was all over the place. She didn't explain. She asked, or she lied, or what? I don't. Well, did you pin her down on why? I think she said, we didn't think it was a problem, so we didn't tell her about it. But the point is, why is isolated incident being construed against a non-movement? She didn't even remember. She said, I probably would have said isolated. OK, so one versus two is the difference. But it wasn't one versus two. It's the difference between diligence and not. It was one versus 600, Your Honor, 600 that DVS knew about. Oh. So I see I'm out of time. No, I meant to ask you when you made a reference to estoppel. Yes. Did you argue both estoppel and equitable tolling to the district court? I think we argued that equitable tolling and fraudulent concealment. I don't believe we argued estoppel, but I could be wrong. But anyway, we're repealing. The opposing counsel's brief suggested that they were mumbled and mixed up. Well, but the court. By the district court would have made a reference to intent to deceive, which was part of your attack on appeal. She was very clearly, the district court on appeal was very, in its order on page 24, very distinctly says, I'm denying equitable tolling. And the first thing she references and spends a whole paragraph on is the intent to deceive issue. So that is clearly not an estoppel issue. But counsel said it's not surprising the way it was, the way you argued it to the district court, that that would have been something the district court focused on. I didn't go back and read your briefs. I will. OK, well. I mean, if you can't remember, I mean, that seems to me, given our many cases saying that we don't require precision in all written articulations, that's rather relevant. If intent to deceive was a major issue argued to the district court and the district court had a paragraph on it, that was not surprising. Well, she clearly said it in the estoppel, in the tolling context, and it doesn't deal with the fact that she was weighing evidence. It's relevant to estoppel. It's not to estoppel, yes, but this is not what we're. I mean, it's relevant to equitable tolling. Intent to deceive is not relevant to equitable tolling. It may not be essential, but it's relevant. Not according to this court's test. It's all about the diligence of the party. It's not about, it's the diligence of the party in extraordinary circumstances. So I'd like to reserve the rest of my time. Wouldn't intentional deception be an extraordinary circumstance? Would intent to deceive? It doesn't matter if it was intent or not. It was deceptive because they misled her. So, thank you. Ms. Anglecar. Thank you, Your Honor. May it please the court, I'm Stephanie Anglecar, and I represent a little over 90 cities in this case as appellees, and I'm arguing on behalf of all of the appellees today. A few points. First of all, frankly, the court got it right, the district court got it right, and we'd ask the court to affirm the denial of equitable tolling. As the record shows, the district court initially had found that there needed to be discovery on equitable tolling and had initially denied the Rule 12 motion and allowed a well-developed record to then be presented to the court, and the court looked at that factual record very carefully, and the order is well-reasoned and based on that factual record. To hit a few points, first of all, the actions after the phone calls with McCormick are important to look at here, and I think that the panel has recognized that. In some ways, this is very much a case to kind of look at the timeline. Those phone calls were early on, and when Miles searched the news script at her news station and found a story from January 5th of 2008 regarding DPS employees looking at 400 records from their home computers, this is after the phone conversations, after, even if it's accepted in the light most favorable that there had been this isolated incident comment, she's now on notice to do some further investigation, and this court has recognized in several equitable tolling cases that when that plaintiff is on notice to do some further investigation, equitable tolling is not appropriate. Frankly, that's enough. What about the position that opposing counsel takes that, well, she was just looking up based on what McCormick said, basically relying on the assertion from the person at the DPS that there was only one. She finds the issue with the bank, that's all resolved, and she relies on that assurance that there's just nothing more. The fact that she took the step to find this news story shows that there was some interest in looking further into what's happening. Additionally, she received and was privy to a tip which has been withheld under journalist privilege but mentioned looking further into DPS. Did she deny knowing that? She did not deny knowing that. She admitted that she had received that. It's documented in an email between her and the general counsel which would be at the appendix A545, 557, and 521, address the correspondence received or the email. It's blacked out so we don't know what the content is. But in any regard, there's something to trigger a need to look further regardless of the isolated incident or the access by the DPS employee. And that's key because it takes away from just simply relying on what McCormick said because there's independent action that Miles took that's in the record and can be just objectively viewed, which is frankly what the district court did when it took another look at this. Also, to clarify and answer the court's question, in terms of this question about isolated incident and the one DPS employee, McCormick was asked about that in her deposition at A449 in the appendix, and she explained, and we footnoted in our brief, that while there had been two DPS employees that looked at Miles, when they were doing these internal audits of what employees had looked at, they determined only this one was a breach. That's why the letter says an employee, referencing one DPS employee, and there's nothing hidden there. There's only a notification if there was something improper. So she wasn't hiding anything by only sending a letter about one employee improperly accessing. Additionally, that letter is important to look at, and the letter itself is at A423. It's also in the addendum. Looking at the plain language of the letter says DPS employee. Reading the letter as a whole, there's no ambiguity to it. It's talking about what this department is going to do with its one employee. Well, if you look at the letter, a reasonable person, do you think a reasonable person would understand that the director of this repository of information, DVS, wouldn't have sort of understanding or knowledge or access to all of the database and then therefore would know about any and all improper or impermissible accesses? I guess I'm thinking about it from the standpoint of just somebody receiving this letter and sort of parsing out who it might cover and who it might not. Like it covers the Minnesota State Patrol, but it doesn't cover the accesses that occurred here. I wonder how you view that. Yes, Your Honor, looking at the plain language of the letter, it's on letterhead that, yes, initially says Minnesota Department of Public Safety. There are the offices or agencies listed on the left side of the letter, which, again, is at A423. And then at the top says Driver and Vehicle Services. And then the actual content of the letter refers to Driver and Vehicle Services, which is one of the agencies listed in the letter. A reasonable person looking at this letter and just reading what McCormick wrote will understand that it's talking about an internal audit conducted by Driver and Vehicle Services revealed the unauthorized viewing of your driving record by an employee. And then it talks about what it would do with the employee. But to support how Miles viewed that, the court can look further. When she was consulting with the general counsel to look into that, they exchanged e-mails where she got a chance to review his draft letters to TCF Bank and to McCormick. She never asked him to change any reference to a DVS employee. Those are in the record at A541 where she made no change to the letter that he had sent. And then in both of those letters reference a DVS employee. Why that's key is because there is absolutely nothing in this record to show that DVS had knowledge of city and county law enforcement accesses. Nothing. The only thing that shows those accesses is an audit that was pulled in 2013. And I encourage this panel to ask counsel to cite in the record where the knowledge is from DVS because it doesn't exist there. As the deposition transcript from Kim Jacobson shows, which her deposition was in 2015 at A673, she explains how these audits are pulled. And in case the court was interested, I know the court has had these cases for the last six years now, but a person, a human being, has to actually take a step to pull the audit. And as Jacobson testified, she has to go into the Minnesota IT program or whatever she uses to actually access it. She has to have the driver's license number of the subject. So there's nothing in the record to show that she had Jessica Campshore's driver's license or Jessica Miles' driver's license and entered it in or that McCormick did that back in 2008. And then it generates a report. Then it gets moved into an Excel spreadsheet. So there are human actions that have to actually take place to generate an audit that looks like the only audit that you have in this record, which is from 2013. This is key because the fact that that data sat unsummoned in 2008 does not show that DVS knew that city and county law enforcement had done the 600 accesses. There's nothing in the record to establish that. Is that necessary, though, or is it a question of whether a reasonable person would have been misled by the communications to think that she was being told there was nothing to look for? That's a good question. Is it necessary, frankly necessary, to rebut the unsupported arguments in the appellant's brief of accusing this agency of having that knowledge? I understand that. But in terms of equitable tolling. Right. That's my question. It's not necessary to look at whether there was knowledge of that or that anybody knew of that at that time because it's not under a Dring versus McDonnell Douglas. The plaintiff doesn't have to wait until they are certain of the claim. They just have to be aware of a possible claim. Here, as the record shows, Miles was on notice to do some further investigation. Again, now is on notice. There may be a potential claim. She didn't have to know of the 600. She didn't have to know exactly at that point. Right. I just think her argument is DVS, the lady, told me that this was an isolated incident and therefore I didn't have to look further because somebody from the government told me in effect that they've checked and there's nothing further. So is that a reasonable thing for her to have believed or do you think that's an unfair characterization of the communications? Well, even if we accept as true that McCormick said isolated incident, the record shows that Miles didn't just sit idly by after that. There were many things that happened. Those two conversations were in May and early June, yet she still went and looked for this news script from January of 2008. She still consulted with counsel. She still looked online herself to kind of look and see what was going on with this. Additionally, her contemporaneous notes from that conversation with McCormick, which are at A490 and A499, talk about how she could get a court order or a subpoena. So objectively looking at the record, even if McCormick said isolated incident, it is inconsistent with the actions that Miles actually took. And again, even if she initially relied on that, as soon as she finds that news script about other accesses, she's on notice to take a further look. Further, in related to this. All right, I understand all that, but I'm a little surprised by the answer. What do you think isolated incident means? It's the DVS employee. So McCormick, it's clear from the record, has knowledge about the DVS employee who was disciplined. And so when she's explaining isolated incident, if she said that, but just accepting it as true if she said that, reading the letter on its face, it's talking about what McCormick knew of this one lookup. And what is key here is because of that, these appellants are no different than any other DPPA plaintiff, and the court recognized this. In Coast v. Hunt, the District Court of Minnesota was especially concerned about the equitable tolling argument being an end run around what the Eighth Circuit has already determined is an accrual rule, not a discovery rule, on the statute of limitations. And by treating a plaintiff's mere lack of knowledge of an injury in the absence of some external factor that stood in their way to be sufficient for equitable tolling would create that end run around the statute of limitations. This court has also denied equitable tolling in Loeffler v. City of Anoka. And then the District Court of Minnesota also found that even for a pro se plaintiff that had difficulties obtaining information, it still did not rise to an extraordinary level of tolling in Smyth v. Onamia. So here, there's no difference from other DPPA plaintiffs of why should the appellants get equitable tolling when nobody else has received it. Additionally, there's no legal basis for Corey Campshore to obtain equitable tolling. There's nothing cited to support that, just because he was in a relationship with her. He's no different than the other DPPA plaintiffs as well. Additionally, the District Court did properly recognize the prejudice to the appellees. This court has suggested that courts should consider whether a defendant has a lack of prejudice or not. The record shows, especially based on retention periods, there would be substantial prejudice to the appellees. So therefore, we would request that the court affirm the denial of equitable tolling. Thank you. Thank you. For rebuttal, Mr. Strauss. Thank you, Your Honor. This is not at all like other DPPA cases. In those cases, the plaintiff simply didn't know about the accesses. Here, Jessica Campshore was misled by the department and was assured there was nothing else to worry about, completely unlike other cases. Everything the counsel was talking about up there disputed facts. What news stories she knew about, what Hubbard's lawyer's role was in all this, the subpoena issue. The subpoena was suggested to learn the identity of this one isolated person, not about anything else. The defendants want isolated incident construed in favor of the defendants on a summary judgment motion. Is equitable tolling an issue of law? Is equitable tolling an issue of law? It requires evidence. This court said in Montanant v. Estate v. Johnson. Would you please answer the question? A lot of issues of law have underlying facts. I asked you if equitable tolling is an issue of law. I think it is, but you would know. Equitable tolling is supposed to be determined de novo, but the factual underpinnings of it are clear error because an evidentiary hearing is supposed to be held to determine what those facts are. It's not supposed to be determined on summary judgment if they're disputed. I see my time is up, Your Honor. Thank you. Thank you, Counsel. The case has been thoroughly briefed and argued. We'll take it under advisory. That completes the morning's arguments. Very good. The court will be in recess until 9 o'clock tomorrow morning. Go ahead. Go ahead. Thank you.